CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

SEP 1 7 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | |
|---|---|
| **LARRY E. THOMPSON,** ) | |
| Plaintiff, ) | Civil Action No. 2:07cv00071 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | By: GLEN M. WILLIAMS |
| Defendant. ) | SENIOR UNITED STATES DISTRICT JUDGE |

*I. Background and Standard of Review*

Plaintiff, Larry E. Thompson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Thompson's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3). (West 2003 & Supp. 2008).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify

a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Thompson filed his applications for DIB and SSI on or about November 16, 2005, alleging disability as of October 15, 2005, due to lung, liver, back and stomach problems. (Record, ("R"), at 15, 60-69, 75.) The claims were denied initially and on reconsideration. (R. at 24-33, 36, 38-49.) Thompson then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on June 12, 2007, at which Thompson was represented by counsel. (R. at 50-51, 350-65.)

By decision dated July 5, 2007, the ALJ denied Thompson's claims. (R. at 12-23.) The ALJ found that Thompson met the insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 17.) The ALJ also found that Thompson had not engaged in substantial gainful activity since October 15, 2005, the alleged onset date. (R. at 17.) The ALJ found that Thompson suffered from a severe impairment, namely chronic obstructive pulmonary disease, ("COPD"). (R. at 18.) The ALJ found, however, that Thompson did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Thompson retained the residual functional capacity to perform the exertional demands required of light work.[1] (R. at 19.) The ALJ also found that Thompson was limited in

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

2

his ability to perform activities around dust or other respiratory irritants, and that he should avoid exposure to temperature extremes. (R. at 19.) Thus, the ALJ found that Thompson could not perform his past relevant work as a tree trimmer or as a foundry worker. (R. at 21.) Based on Thompson's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Thompson could perform, including those of a food preparation worker, a food service worker, an assembler, a sorter, a non-construction laborer, an attendant and a cashier. (R. at 22.) Therefore, the ALJ concluded that Thompson was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Thompson pursued his administrative appeals, (R. at 11), but the Appeals Council denied his request for review. (R. at 5-7.) Thompson then filed an action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.148 (2008). This case is before this court on Thompson's motion for summary judgment, which was filed on June 25, 2008, and on the Commissioner's motion for summary judgment, which was filed on August 27, 2008.

## II. Facts

Thompson was born in 1961, (R. at 60, 65, 354), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c),

3

416.963(c) (2008). Thompson has a high school education and past relevant work experience as a foundry worker and a tree trimmer. (R. at 76, 80, 355-56.)

Thompson testified that during the course of his high school education, he was placed in special education classes because of a learning disability. (R. at 354.) He also testified that he drove a motor vehicle on occasion, but due to carpal tunnel syndrome in his hands, he could only drive four to six miles before his hands would become numb. (R. at 355.) Thompson testified that he was last employed as a tree trimmer. (R. at 355.) He also testified that during the course of that employment, he engaged in ground work and climbing work. (R. at 355-56.) Thompson testified that he had also previously worked at a foundry. (R. at 356.) He testified that during the course of that employment, he was required to occasionally lift items weighing more than 20 pounds. (R. at 356.)

Thompson testified that "breathing problems" were his most serious medical problem, and stated that he stopped working because of shortness of breath, wheezing and chest pain. (R. at 356-57.) He also testified that he smoked approximately one to one and a half packs of cigarettes a day. (R. at 357.) Thompson testified that he had back pain, which radiated to both legs. (R. at 358.) He also testified that he had never undergone back surgery. (R. at 358.) Thompson testified that he had diabetes, which was controlled by diet and medication. (R. at 358, 361.) He also testified that he only took oral medication for his diabetes. (R. at 361.) Thompson testified that he suffered from anxiety and depression, and that he had recently sought psychological assistance to address his problems. (R. at 36-62.) Thompson testified that he felt nervous at

4

times, and that he had to take nerve pills. (R. at 359.) He also testified that he needed to lie down during the day for varying durations because he had trouble walking. (R. at 360.)

Kathy D. Sanders, a vocational expert, also was present and testified at Thompson's hearing. (R. at 362-64.) Sanders classified Thompson's past relevant work as a tree trimmer as medium[2] and unskilled work and his work as a foundry worker as light and unskilled. (R. at 362-63.) Sanders was asked to consider a hypothetical individual of Thompson's age, education and work history who could perform light work, but who must avoid hazards such as dust and other respiratory irritants and exposure to temperature extremes. (R. at 363.) Sanders testified that such an individual could perform work as a food preparation worker, a non-construction laborer, an attendant at an arcade, a cashier, an assembler and a sorter. (R. at 363.) Sanders was next asked to consider the same individual, but also to consider that this individual possessed the limitations set forth in Dr. Foster's Pulmonary Function Test Report. (R. at 363-64.) Sanders testified that such an individual could not perform any work. (R. at 364.)

In rendering his decision, the ALJ reviewed records from Holston Valley Medical Center; Dr. Larry J. Foster, M.D.; Dr. Fred A. Merkel, D.O.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Thomas V. Thomas, M.D.; Dr. James Bryston Winegar, M.D.; Dr. Michael J. Hartman, M.D., a state agency physician; Dr.

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c), 416.967(c) (2008).

Frank M. Johnson, M.D., a state agency physician; Dr. Gurcharan Singh, M.D.; Dr. Manoj Srinath, M.D.; and Robin K Szymanski, R.M.A.

On January 28, 2005, Thompson presented to Dr. James Bryston Winegar, M.D., with complaints of lower abdominal pain, which had persisted for a week. (R. at 177.) An examination revealed that Thompson's abdomen was soft and non-tender and that there was swelling and tenderness on the right epididymis. (R. at 177.) Dr. Winegar diagnosed acute epididymitis. (R. at 177.) Thompson returned to Dr. Winegar's office on April 29, 2005, with complaints of lower bowel pain, as well as burning and pain in the lower abdomen. (R. at 175.) Dr. Winegar diagnosed bilateral lower abdominal pain and questionable early epididymitis or prostatitis. (R. at 175.) He suggested that Thompson undergo a barium enema, but Thompson reported he could not afford the procedure. (R. at 175.)

On September 28, 2005, Thompson again presented to Dr. Winegar's office with complaints of recurrent lower abdominal pain and testicular pain. (R. at 168.) Thompson reported that he was unable to work because of the pain. (R. at 168.) Thompson's lungs were clear to auscultation. (R. at 168.) Upon examination, Thompson was found to be in moderate distress with lower bowel pain, to have moderate tenderness in the lower abdomen bilaterally with some guarding, to have swelling and tenderness of the left epididymis and to have a normal prostate. (R. at 168.) Dr. Winegar diagnosed lower abdominal pain with epididymitis, but noted that Thompson's lower abdominal tenderness raised the possibility of diverticulitis. (R. at 168.) Dr. Winegar ordered Thompson off work for a week, and Thompson was

6

scheduled to undergo a computerized tomography scan, ("CT scan"), of the abdomen and pelvis. (R. at 168.) On that same date, x-rays of Thompson's chest revealed no free peritoneal air, no pleural effusions and a heart size within normal limits. (R. at 145.) The x-rays ruled out the presence of an acute pulmonary disease. (R. at 145.) X-rays of Thompson's abdomen revealed degenerative changes around both sacroiliac joints. (R. at 170.) On September 30, 2005, blood work revealed a slight elevation of glucose and a minimal elevation of liver enzymes. (R. at 167.)

On October 5, 2005, a CT scan of Thompson's abdomen revealed small noncalcified nodules within both lung bases and a small calcified granuloma within the anterior of the left lung base. (R. at 143.) The scan also revealed decreased attenuation throughout the liver, which suggested fatty infiltration. (R. at 143.) The spleen, pancreas, gallbladder, adrenal glands and kidneys were unremarkable. (R. at 143.) The scan also revealed no free fluid or abnormal fluid collection and no large lymph nodes. (R. at 143.) On October 5, 2005, a CT scan of Thompson's pelvis was negative. (R. at 144.)

Thompson presented to Dr. Winegar again on October 7, 2005, for a follow-up regarding his lower abdominal pain. (R. at 160.) Thompson reported improvement in his pain. (R. at 160.) Dr. Winegar reported a blood sugar level of 132 and diagnosed Thompson with mild type II diabetes mellitus. (R. at 160.) He also noted elevated liver enzymes. (R. at 160.) Dr. Winegar ordered Thompson back to work on October 10, 2005. (R. at 160.) A radiology report dated October 15, 2005, revealed no evidence of active abdominal disease. (R. at 155.)

7

On October 19, 2005, Thompson presented to Dr. Fred A. Merkel, D.O., with complaints of pain in his right groin area. (R. at 151-52.) Thompson reported that healthcare professionals at Holston Valley Medical Center, ("HVMC"), informed him that he had a hernia. (R. at 151.) He also reported that he was not working due to the pain. (R. at 151.) Thompson's abdomen was soft, with tenderness noted in the periumbilical and right lower quadrant areas. (R. at 151.) Thompson also was tender in his right epididymis area. (R. at 151.) Dr. Merkel diagnosed diabetes mellitus, fatty liver and a probable hernia. (R. at 151.) Thompson was referred to Dr. Thomas V. Thomas, M.D., a general surgeon. (R. at 152.)

On October 20, 2005, Thompson presented to Dr. Thomas for evaluation of a possible right groin hernia. (R. at 149.) Physical examination of Thompson revealed a clear chest and a soft and non-tender abdomen with good bowel sounds. (R. at 149.) No definite palpable hernias were detected; however, Thompson was tender in the groin, particularly above the testicle. (R. at 149.) Dr. Thomas noted that CT scans of Thompson's abdomen and pelvis were unremarkable with the exception of a fatty liver and some small basilar pulmonary non-calcified lung nodules. (R. at 149.) Dr. Thomas reported that it was possible that Thompson had a small hernia. (R. at 149.) Because Thompson felt more observation would be futile, he requested that Dr. Thomas perform a diagnostic laparoscopy to help determine the cause of his pain. (R. at 149.)

8

On October 24, 2005, a diagnostic laparoscopy was performed by Dr. Thomas. (R. at 192.) Dr. Thomas found no direct, indirect or femoral hernia defects in the right groin area. (R. at 192.) Dr. Thomas also found that the right lower quadrant had no adhesions or signs of inflammatory change. (R. at 192.) He also noted that the left groin area had no sign of an inguinal hernia, but he did find some adhesions of the sigmoid to the iliac fossa that suggested possible previous mild diverticulitis. (R. at 192.) He further reported that nothing in the lower midline abdominal wall was seen that was out of the ordinary. (R. at 192.) At a follow-up appointment on November 1, 2005, Dr. Thomas reported that Thompson was doing better, and he assessed chronic right groin pain. (R. at 191.)

After being referred by Dr. Winegar, Thompson presented to Dr. Manoj Srinath, M.D., on November 4, 2005, with a chief complaint of abdominal pain, which Thompson reported had persisted for the last four years. (R. at 156, 189-90.) Thompson reported that the pain was worse with lifting and straining and that nothing relieved his pain. (R. at 189.) An examination revealed normal breathing sounds bilaterally, no organomegaly, normal bowel sounds and soft, mild tenderness in the epigastric region, but no rebound. (R. at 189-90.) Thompson was diagnosed with abdominal pain, probably musculoskeletal in etiology, and lung nodules. (R. at 190.) Dr. Srinath also noted elevated liver function tests. (R. at 190.) Dr. Srinath noted the possibility of trigger point injections in the future and recommended several tests, including an esophagogastroduodenoscopy, ("EGD"). (R. at 190.)

9

Thompson presented to Dr. Merkel on November 11, 2005, with complaints of abdominal discomfort, groin pain and chest pain when lying down. (R. at 267.) Thompson reported that his chest pain occurred twice a week, and that he was unable to work because of the pain in his groin. (R. at 182.) Dr. Merkel noted that Thompson did not appear to be in any major pain. (R. at 182.) An examination revealed good range of motion in Thompson's hips, but tenderness with both extreme range of motion and internal range of motion. (R. at 182.) The examination also revealed a soft and tender abdomen. (R. at 182.) Dr. Merkel noted that Thompson's pelvis x-ray and his electrocardiogram, ("EKG"), were both unremarkable. (R. at 182.) Dr. Merkel diagnosed abdominal pain of an unknown etiology, fatty liver by history and chest pain. (R. at 182.)

Thompson returned to Dr. Merkel's office on November 23, 2005, with continued complaints of abdominal pain. (R. at 180-81.) Thompson reported that his chest pain was no longer problematic. (R. at 180.) An examination revealed abdominal tenderness, but no guarding or rebound. (R. at 180.) Dr. Merkel also noted that Thompson was quite tender over the sacral base and over the lumbar spine, especially at the L5 level of the spine, where Dr. Merkel noted decreased range of motion. (R. at 180.) Dr. Merkel adjusted Thompson's spine, diagnosed abdominal and low back pain and ordered x-rays of the lumbosacral spine. (R. at 181.) X-rays of the lumbar spine taken on November 23, 2005, revealed normal alignment of the lumbar spine, normal vertebral body heights, no pars defects and no evidence of fracture, subluxation or bony destruction. (R. at 265.)

10

Thompson returned for a back adjustment on November 30, 2005. (R. at 178-79.) Thompson continued to have complaints of abdominal pain, particularly in the right lower quadrant and indicated that he was unable to work. (R. at 178.) Dr. Merkel noted tenderness over the L3-L4 and L5-S1 levels of the spine and decreased range of motion. (R. at 178.) He also noted tenderness over the right lower quadrant, the epigastrium and the periumbilical area. (R. at 178.) Dr. Merkel diagnosed abdominal and low back pain. (R. at 178.) He ordered Thompson off work for a week and noted that Thompson may need to apply for disability because of his low back pain. (R. at 179.) Dr. Merkel noted, however, that Thompson would need a colonoscopy and magnetic resonance imaging, ("MRI"), of the spine before he could determine the etiology of Thompson's pain. (R. at 179.)

Thompson returned to Dr. Merkel's office on December 7, 2005, with continued complaints of abdominal pain. (R. at 259-60.) Thompson complained that he was unable to sit or stand without experiencing pain. (R. at 259.) It was noted that Thompson missed three days of work in October, one day of work in November and that he had not worked at all in December because of his pain. (R. at 259.) An examination revealed tenderness over the abdomen, thighs and inguinal area. (R. at 259.) Dr. Merkel diagnosed abdominal pain of an unknown etiology and provided Thompson with a form which would allow him off work for the next two months in order to visit Dr. Sam Breeding, M.D. (R. at 259.)

On December 8, 2005, Thompson underwent an EGD, which revealed chronic gastritis with minimal activity and areas of intestinal metaplasia and rare helicobacter

pylori organisms in the stomach. (R. at 255.) The EGD also revealed glandular mucosa with mild lamina propria chronic inflammation, no intestinal metaplasia or dysplasia and unremarkable squamous epithelium in the distal esophagus. (R. at 255.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on January 17, 2006. (R. at 217-23.) Dr. Surrusco found that Thompson could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that he had an unlimited ability to push and/or pull. (R. at 218.) Dr. Surrusco opined that Thompson could occasionally climb and stoop, and that he could frequently balance, kneel, crouch and crawl. (R. at 219.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 219-20.) Dr. Surrusco also noted that Thompson's subjective allegations were only partially credible. (R. at 222.)

Thompson returned to Dr. Merkel on January 31, 2006, and requested that his disability paperwork be completed and signed. (R. at 249.) Thompson stated that he was unable to afford a consultation to Dr. Breeding, and reported that he would seek disability benefits through the Social Security Administration. (R. at 249.) Dr. Merkel provided Thompson with a note excusing him from work for 60 days, but noted that he would not provide such notes in the future. (R. at 250.) He advised Thompson to seek a specialist to declare him unable to work. (R. at 250.) Dr. Merkel also noted that Thompson had undergone various tests to determine the etiology of his chronic abdominal pain, chronic hip pain and back pain; however, no etiology had been found

12

for any of the pain. (R. at 250.) Dr. Merkel noted that x-rays of Thompson's lumbar spine and both hips were unremarkable. (R. at 250.) He also noted that an EGD showed gastritis and possible Barrettes esophagitis. (R. at 250.) Dr. Merkel diagnosed abdominal pain of an unknown etiology and low back pain. (R. at 250.)

On February 7, 2006, Thompson presented to Dr. Merkel with complaints of left arm numbness and abdominal pain. (R. at 247.) Thompson was diagnosed with carpal tunnel syndrome and was given a night splint for his left wrist. (R. at 247.) On February 10, 2006, Thompson complained of continued, unimproved abdominal pain and requested a colonoscopy. (R. at 245-46.) Dr. Srinath noted that Thompson's abdominal pain was most likely musculoskeletal in origin. (R. at 245.) On February 13, 2006, a CT scan of the chest revealed a grossly stable non-calcified nodule in the right middle lobe. (R. at 243.) Other nodules appearing in both lungs were noted to be most likely non-calcified granulomas. (R. at 243.) To further rule out malignancy, the radiologist recommended a follow-up CT scan in six months. (R. at 243.)

On February 14, 2006, Thompson presented to Dr. Merkel, complaining of a cyst on his back and cysts on his shoulder, which caused soreness. (R. at 241.) Dr. Merkel noted that Thompson had a three-centimeter mobile, subcutaneous nodule under the skin on his back, which was non-tender to palpation. (R. at 241.) Dr. Merkel removed the cyst on Thompson's back. (R. at 242.) Thompson returned on February 17, 2006, for a follow-up regarding the removal of the cyst and reported that he continued to experience pain in his shoulder. (R. at 240.) Dr. Merkel noted that Thompson's incision was healing, but that his right shoulder cyst was probably

13

infected. (R. at 240.) As such, Dr. Merkel prescribed antibiotics. (R. at 240.) Thompson later had his right shoulder cyst drained and it responded well to the removal. (R. at 232-37.)

On February 24, 2006, Thompson sought treatment from Dr. Larry J. Foster, M.D., a pulmonary specialist. (R. at 224-27.) Dr. Foster reported that Thompson experienced daily productive cough, shortness of breath with exertion and bouts of wheezing. (R. at 224.) He also reported that Thompson had smoked cigarettes for 30 years. (R. at 224.) Dr. Foster performed a spirometry test, which demonstrated a severe reduction in FVC, ("Forced Vital Capacity"), a severe reduction in $FEV_1$, ("Forced Expiratory Volume"), and a reduced $FEV_{1\%}$. (R. at 225.) The procedure also demonstrated that Thompson's diffusing capacity was mildly reduced, and that his lung volumes revealed elevation in residual volume. (R. at 225.) Dr. Foster reviewed a CT scan from February 14, 2006, which indicated small, bilateral non-calcified lung nodules. (R. at 225.) Thompson was diagnosed with severe COPD and smoking dependence. (R. at 225.) Dr. Foster advised Thompson to quit smoking and recommended that Thompson undergo another CT scan in six months. (R. at 225.) On March 24, 2006, Thompson reported to HVMC for a total colonoscopy with snare polypectomy. (R. at 275-76.) He was diagnosed with diverticulosis coli and sigmoid colon polyps, status post snare polypectomy. (R. at 275.) The remainder of the colonic mucosa was normal, as was the terminal ileum. (R. at 275.)

Thompson presented to Dr. Merkel on April 10, 2006, with continued complaints of pain in his abdomen, right testicle, back and hips. (R. at 341-42.)

14

Thompson complained of pain when walking or lying down. (R. at 341.) Dr. Merkel noted guarding of the right colon area, tenderness in the greater trochanteric area bilaterally and tenderness of the lumbar spine and sacral base. (R. at 341.) He also noted good range of motion of the hips. (R. at 341.) Thompson requested a note stating that he was unable to work for three months, which Dr. Merkel provided, but warned he would not provide again, reiterating that Thompson needed to be evaluated by a specialist. (R. at 342.) Dr. Merkel diagnosed chronic diverticulosis based on Thompson's recent colonoscopy. (R. at 342.)

Dr. Michael J. Hartman, M.D., a state agency physician, completed a PRFC on April 13, 2006. (R. at 277-83.) He found that Thompson could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that he had an unlimited ability to push and/or pull. (R. at 278.) Dr. Hartman opined that Thompson could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 279.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 279-80) Dr. Hartman also noted that Thompson's subjective allegations were only partially credible. (R. at 282.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a PRFC on May 9, 2006. (R. at 284-90.) He found that Thompson could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that he had an unlimited ability to push and/or pull. (R. at 285.) Dr. Johnson opined

15

that Thompson could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 286.) He imposed no manipulative, visual or communicative limitations. (R. at 286-87.) Dr. Johnson noted that Thompson should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (R. at 287.) He also opined that Thompson should avoid all exposure to hazards, such as heights and machinery. (R. at 287.) Lastly, he noted that Thompson's subjective allegations were only partially credible. (R. at 289.)

On May 12, 2006, Thompson complained of lower quadrant and testicular pain. (R. at 339.) Dr. Srinath noted that Thompson had no specific aggravating or relieving factors, and that he had undergone extensive evaluation, including a colonoscopy which revealed a tubular adenoma and an EGD which revealed gastritis. (R. at 339.) Dr. Srinath diagnosed abdominal pain, but reported that the etiology of the pain was unclear. (R. at 339.)

On May 26, 2006, Dr. Gurcharan Singh, M.D., completed a Medical Consultant's Review of Physical Residual Functional Capacity Assessment Form. (R. at 347-48.) Dr. Singh disagreed with Dr. Johnson's assessment of Thompson's environmental limitations. (R. at 347.) Dr. Singh indicated that avoiding all exposure to hazards was unrealistic and it would be more realistic for Thompson to avoid concentrated exposure. (R. at 347.) Dr. Singh determined that Dr. Johnson's PRFC was otherwise reasonable. (R. at 347.)

16

On June 15, 2006, Dr. Merkel noted that Thompson was able to walk two blocks with some difficulty due to shortness of breath. (R. at 335.) Physical examination revealed a few rhonchi in the lungs, but no wheezes were heard. (R. at 336.) Dr. Merkel noted that Thompson had a fatty liver and elevated liver enzymes. (R. at 335.) A CT scan of Thompson's abdomen and pelvis showed fatty infiltration of the liver. (R. at 335.) Dr. Merkel diagnosed elevated liver enzymes, diabetes mellitus and abdominal pain of an unknown etiology. (R. at 336.)

In a letter dated July 24, 2006, in response to Thompson's request for a letter regarding his ability to work, Dr. Foster related to Thompson that he was unable to determine whether Thompson had the ability to work. (R. at 301.) However, Dr. Foster stated that Thompson's pulmonary function studies demonstrated severe COPD or emphysema. (R. at 301.) Dr. Foster also noted that it would be difficult for Thompson to perform any type of exertional activities that required heavy lifting or working in environments where there would be noxious fumes, dust and odors. (R. at 301.)

On September 11, 2006, Thompson returned to Dr. Foster's office for a follow-up visit regarding his lung nodules. (R. at 298-99.) Thompson complained of increasing shortness of breath and reported that he had not smoked in the last eight days. (R. at 298.) Dr. Thompson reviewed a CT scan from Holston Medical Group, dated August 28, 2006, which revealed stable pulmonary nodules. (R. at 298, 303.) He noted that Thompson's lung nodules were too small to be easily approached with fine-needle aspirate and recommended radiographic follow-up and a CT scan every six

17

months. (R. at 299.) Dr. Foster also noted that an examination of Thompson's lungs revealed diminished quality of breathing sounds, but no wheezing or large airway rhonchi. (R. at 298.) Thompson was diagnosed with severe COPD and bilateral small lung nodules. (R. at 298.) Thompson was prescribed Chantix and Spiriva. (R. at 299.)

On September 15, 2006, Thompson reported that he had stopped smoking for two weeks. (R. at 323.) Thompson also reported that he applied for disability benefits due to his abdominal pain. (R. at 323.) Dr. Merkel noted that "[n]o one really has a good etiology of the discomfort, except it seems to be a pulled muscle, but does not really go away." (R. at 323.) Dr. Merkel also reported that Thompson did not take medication for his abdominal discomfort, and that he had "no real back pain." (R. at 323.) Dr. Merkel diagnosed abdominal discomfort of an unknown etiology, diabetes mellitus and nicotine addiction. (R. at 324.)

Thompson returned to Dr. Merkel's office on January 19, 2007, for a follow-up visit. (R. at 312-13.) Thompson denied any chest pain, but reported that he had bad nerves and that he experienced "shakiness at times." (R. at 312.) Dr. Merkel diagnosed severe COPD, anxiety and abdominal pain of an unknown etiology. (R. at 313.) On April 19, 2007, Thompson was seen again. (R. at 307-08.) Thompson reported no problems with chest pain or shortness of breath. (R. at 307.) Thompson did report low back pain. (R. at 307.) A straight leg-raising test was found to be negative and tenderness was noted in the lumbar spine and sacral base. (R. at 308.)

18

Dr. Merkel diagnosed COPD, diabetes mellitus, obesity and probable diabetic neuropathy. (R. at 308.)

On April 26, 2007, Dr. Foster completed a Pulmonary Residual Functional Capacity Questionnaire. (R. at 291-95.) Dr. Foster reported that Thompson was only capable of low stress jobs because of severe pulmonary function impairment. (R. at 293.) Dr. Foster reported that Thompson would frequently experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. (R. at 293.) He also reported that Thompson was able to occasionally lift items weighing up to 10 pounds and rarely lift items weighing up to 20 pounds. (R. at 294.) Dr. Foster reported that Thompson was able to sit for more than two hours and stand for 30 minutes at any one time. (R. at 294.) He reported that Thompson was able to stand and/or walk for less than two hours and sit for at least six hours in a typical eight-hour workday. (R. at 294.) He also noted that Thompson could occasionally twist and stoop, could rarely crouch and/or squat and could never climb ladders or stairs. (R. at 294.) Dr. Foster reported that Thompson would need to take multiple, extensive, unscheduled breaks during a typical eight-hour workday. (R. at 294.) Dr. Foster indicated that Thompson should avoid all exposure to cigarette smoke, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust and chemicals. (R. at 295.) He also indicated that Thompson should avoid even moderate exposure to extreme cold and heat, high humidity and perfumes. (R. at 295.) Dr. Foster estimated that Thompson would be absent from work for more than four days per month as a result of his impairments or treatments. (R. at 295.)

19

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

20

By decision dated July 5, 2007, the ALJ denied Thompson's claims. (R. at 12-23.) The ALJ found that Thompson met the insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 17.) The ALJ also found that Thompson had not engaged in substantial gainful activity since October 15, 2005, the alleged onset date. (R. at 17.) The ALJ found that Thompson suffered from a severe impairment, namely chronic obstructive pulmonary disease, ("COPD"). (R. at 18.) The ALJ found, however, that Thompson did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ found that Thompson retained the residual functional capacity to perform the exertional demands required of light work. (R. at 19.) The ALJ also found that Thompson was limited in his ability to perform activities around dust or other respiratory irritants, and that he should avoid exposure to temperature extremes. (R. at 19.) Thus, the ALJ found that Thompson could not perform his past relevant work as a tree trimmer or as a foundry worker. (R. at 21.) Based on Thompson's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Thompson could perform, including those of a food preparation worker, a food service worker, an assembler, a sorter, a non-construction laborer, an attendant and a cashier. (R. at 22.) Therefore, the ALJ concluded that Thompson was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

21

Thompson argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-13.) Specifically, Thompson argues that the ALJ erred by not according proper weight to the opinion of Dr. Larry J. Foster, M.D., Thompson's pulmonary specialist. (Plaintiff's Brief at 7-11.) Secondly, Thompson argues that the ALJ failed to provide adequate rationale for rejecting the limitations noted by the state agency physicians. (Plaintiff's Brief at 11-13.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong

22

reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Thompson's first argument is that the decision of the ALJ was not based upon substantial evidence. (Plaintiff's Brief at 7-11.) In particular, Thompson contends that the ALJ failed to accord proper weight to the opinion of Dr. Larry J. Foster, M.D., Thompson's pulmonary specialist. (Plaintiff's Brief at 7-11.)

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[3] In fact, "if a physician's opinion is not supported by the

---

[3] *Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

23

clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Dr. Foster first examined Thompson on February 24, 2006, upon referral by Dr. Merkel for evaluation of lung nodules, a daily productive cough, shortness of breath with exertion and bouts of wheezing. (R. at 224) Dr. Foster performed a spirometry test, which demonstrated a severe reduction in FVC, a severe reduction in $FEV_1$ and a reduced $FEV_{1\%}$. (R. at 225.) The procedure also demonstrated that Thompson's diffusing capacity was mildly reduced, and that his lung volumes revealed elevation in residual volume. (R. at 225.) Dr. Foster reviewed a CT scan from February 14, 2006, which indicated small, bilateral non-calcified lung nodules. (R. at 225.) Thompson was diagnosed with severe COPD and smoking dependence. (R. at 225.) Dr. Foster advised Thompson to quit smoking and recommended that Thompson undergo another CT scan in six months. (R. at 225.)

Following this visit, in a letter dated July 24, 2006, in response to Thompson's request for a letter regarding his ability to work, Dr. Foster related to Thompson that he was unable to determine whether Thompson had the ability to work. (R. at 301.) However, Dr. Foster stated that Thompson's pulmonary function studies demonstrated severe COPD or emphysema. (R. at 301.) Dr. Foster also noted that it would be difficult for Thompson to perform any type of exertional activities that required heavy lifting or working in environments where there would be noxious fumes, dust and odors. (R. at 301.)

24

On September 11, 2006, Thompson returned to Dr. Foster's office for a follow-up visit regarding his lung nodules. (R. at 298-99.) Thompson complained of increasing shortness of breath and reported that he had not smoked in the last eight days. (R. at 298.) Dr. Foster reviewed a CT scan from Holston Medical Group, dated August 28, 2006, which revealed stable pulmonary nodules. (R. at 298, 303.) He noted that Thompson's lung nodules were too small to be easily approached with fine-needle aspirate and recommended radiographic follow-up and a CT scan every six months. (R. at 299.) Dr. Foster also noted that an examination of Thompson's lungs revealed diminished quality of breathing sounds, but no wheezing or large airway rhonchi. (R. at 298.) Thompson was diagnosed with severe COPD and bilateral small lung nodules. (R. at 298.) Thompson was prescribed Chantix and Spiriva. (R. at 299.)

On April 26, 2007, Dr. Foster completed a Pulmonary Residual Functional Capacity Questionnaire. (R. at 291-95.) Dr. Foster reported that Thompson was only capable of low stress jobs because of severe pulmonary function impairment. (R. at 293.) Dr. Foster reported that Thompson would frequently experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. (R. at 293.) He also reported that Thompson was able to occasionally lift items weighing up to 10 pounds and rarely lift items weighing up to 20 pounds. (R. at 294.) Dr. Foster reported that Thompson was able to sit for more than two hours and stand for 30 minutes at any one time. (R. at 294.) He reported that Thompson was able to stand and/or walk for less than two hours and sit for at least six hours in a typical eight-hour workday. (R. at 294.) He also noted that

Thompson could occasionally twist and stoop, could rarely crouch and/or squat, and could never climb ladders or stairs. (R. at 294.) Dr. Foster reported that Thompson would need to take multiple, extensive, unscheduled breaks during the typical eight-hour workday. (R. at 294.) Dr. Foster indicated that Thompson should avoid all exposure to cigarette smoke, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust and chemicals. (R. at 295.) He also indicated that Thompson should avoid even moderate exposure to extreme cold and heat, high humidity and perfumes. (R. at 295.) Dr. Foster estimated that Thompson would be absent from work for more than four days per month as a result of his impairments or treatments. (R. at 295.)

The court finds that the ALJ accorded the proper weight to the opinion of Dr. Foster. As summarized above, Thompson visited Dr. Foster on two different occasions. (R. at 224-227, 298-99.) The medical record shows that Dr. Foster noted no significant changes in Thompson's condition during these visits. (R. at 224-227, 298-99.) Furthermore, as noted by the ALJ, Thompson continued to smoke during this time period, suggesting his slightly worsened condition may have been caused by his continued smoking. (R. at 19.)

The substantive nature of Dr. Foster's findings, with regard to Thompson's condition, was very consistent between Thompson's two visits. (R. at 224-227, 298-99.) However, on April 26, 2007, nearly eight months after having examined Thompson, Dr. Foster completed a Pulmonary Residual Functional Capacity Questionnaire, (PRFCQ), which noted physical limitations inconsistent with his previous determination of Thompson's ability to work. (R. at 291-95.) Previously, Dr.

26

Foster stated that Thompson would have difficulty with heavy lifting. (R. at 301.) However, in the PRFCQ, Dr. Foster stated that Thompson was only capable of performing low stress jobs because of severe pulmonary function impairment. (R. at 293.) In addition, Dr. Foster noted several limitations finding that Thompson could only sit for two hours and stand for only 30 minutes at any one time. (R. at 294.) Thus, I am of the opinion that the ALJ was correct in according less weight to Dr. Foster's opinion based on his seemingly inconsistent assessments of Thompson's condition. (R. at 19.)

Moreover, in determining that Thompson retained the residual functional capacity for light work, with no activities around dust or other respiratory irritants and exposure to temperature extremes, (R. at 19.), the ALJ's finding was consistent with Thompson's other treating physicians, as well as the state agency physicians. With regard to the other treating physicians, none of them made significant medical findings that would impair Thompson's ability to perform light work as determined by the ALJ.

As summarized earlier, Thompson reported to Dr. Winegar with lower abdominal pain, lower bowel pain, and testicular pain. (R. at 160, 168, 177.) While Dr. Winegar ordered Thompson off work for one week, x-rays ruled out the presence of an acute pulmonary disease, (R. at 145), and a CT scan of Thompson's pelvis was negative. (R. at 144.) In addition, a radiology report revealed no evidence of active abdominal disease. (R. at 155.)

27

Thompson then reported to Dr. Thomas for evaluation of a possible right groin hernia. (R. at 149.) A physical examination revealed a non-tender abdomen with good bowel sounds, (R. at 149), and CT scans of Thompson's abdomen and pelvis were unremarkable. (R. at 149.) After a diagnostic laparoscopy, Dr. Thomas found no direct, indirect or femoral hernia defects in the right groin area. (R. at 149.)

Thompson next reported to Dr. Srinath with reported abdominal pain. Dr. Srinath's examination revealed normal breathing sounds and normal bowel sounds. (R. at 189-190.) Thompson then reported to Dr. Merkel on several different occasions with reported abdominal pain, chest pain, and tenderness in the spine. (R. at 180, 267.) Dr. Merkel's examination revealed abdominal tenderness but found no structural defects in the spine. (R. at 180, 265.) After several more visits with continued complaints of abdominal pain, Dr. Merkel made no significant diagnoses, but nonetheless ordered Thompson to take some time off work. (R. at 179, 259.) At his fifth visit to Dr. Merkel, Thompson sought completion of his disability paperwork. (R. at 249.) At this point, Dr. Merkel provided Thompson with a note excusing him from work for 60 days, but noted that he would not provide such notes in the future. (R. at 250.) It was at this point that Dr. Merkel advised Thompson to seek a specialist to declare him unable to work, as Dr. Merkel was unable to provide any definitive explanation as to the cause of Thompson's complaint. (R. at 250.) Thompson continued to visit Dr. Merkel with reported left arm numbness, abdominal pain, as well as cysts on his back and shoulders, causing soreness. (R. at 241.)

As is evident from the record, Thompson made several visits to various treating physicians citing a wide range of symptoms, however, none of these examining physicians made any significant medical findings as to his condition. In addition to these treating physicians, the ALJ also relied on PRFC's submitted by the state agency physicians. With regard to the testimony of these non-treating physicians, the Fourth Circuit Court of Appeals indicated that such testimony should be discounted and does not constitute substantial evidence when it is totally contradicted by other evidence in the record. *Martin v. Secretary*, 492 F.2d 905, 908 (4th Cir. 1974). However, the court ruled in *Kyle v. Cohen*, 449 F.2d 489 (4th Cir. 1971), that the testimony of a non-examining, non-treating physician can be used and relied upon if it is consistent with the record. Finally, "if the medical expert testimony from examining or treating physicians goes both ways, an ALJ's determination coming down on the side on which the non-examining, non-treating physician finds himself should stand." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

All three state agency physicians, each of whom submitted a PRFC, made identical findings based on the medical records of the treating physicians. These findings determined that Thompson could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday and that he had an unlimited ability to push and/or pull. (R. at 218, 278, 285.) They also opined that Thompson could occasionally climb and stoop, and that he could frequently balance, kneel, crouch and crawl. (R. at 219, 279, 286.) They imposed no manipulative, visual, communicative or environmental limitations. (R. at 219-20, 279-80, 286-87.) All

29

three also noted that Thompson's subjective allegations were only partially credible. (R. at 222, 282, 289.) The findings made by all three state agency physicians were consistent with the series of diagnoses made by the treating physicians, up until the inconsistent diagnosis made by Dr. Foster.

After reviewing the relevant medical evidence, the undersigned is of the opinion that the ALJ's decision to accord less weight to the opinion of Dr. Foster is supported by substantial evidence. In this case, despite the limitations noted by one treating source, specifically Dr. Foster's opinion that Thompson was only capable of performing low stress jobs because of severe pulmonary function impairment, (R. at 293), I find that this opinion was inconsistent with other substantial evidence. Therefore, because the opinion of the treating physician was inconsistent with other substantial evidence of record, the ALJ did not err by according the opinions significantly less weight. *See Craig*, 76 F.3d at 590.[4]

Thompson's second argument is that the ALJ failed to provide adequate rationale for rejecting the limitations noted by the state agency physicians. (Plaintiff's Brief at 11-13.)

After careful consideration of the entire record, the ALJ found that Thompson had the residual functional capacity to perform light work, with no activities around

---

[4] Thompson also asserts that Dr. Foster's opinion should be accorded greater weight because he is a specialist in the field of psychiatry. *See* 20 C.F.R. 404.1527(d)(5), 416.927(d)(5) (2008). The court recognizes this general rule; however, as discussed above, Dr. Foster's opinion is inconsistent with other substantial evidence of record. As a result, the ALJ properly accorded less weight to Dr. Foster's opinion.

30

dust or other respiratory irritants and exposure to temperature extremes. (R. at 19.) Such a finding was consistent with the opinions set forth by all three state agency physicians, each of which stated that Thompson would have difficulty in doing any type of exertional activity such as heavy lifting or working in environments where there would be noxious fumes, dust, or odors that would impact Thompson's respiratory ailments. In noting Thompson's physical limitations, each of the state agency physicians opined that Thompson could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of six hours in an eight-hour workday, and that he had an unlimited ability to push and/or pull. (R. at 218, 278, 285.) They also opined that Thompson could occasionally climb and stoop, and that he could frequently balance, kneel, crouch and crawl. (R. at 219, 279, 286.) They imposed no manipulative, visual, communicative or environmental limitations. (R. at 219-20, 279-80, 286-87.)

The court notes that the ALJ's failure to explicitly reference the postural limitations imposed by the state agency physicians constitutes harmless error. *See Austin v. Astrue*, 2007 WL 3070601, *6 (W.D. Va. Oct. 18, 2007) (holding that errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error) (citing *Camp v. Massanari*, 2001 WL 1658913 (4th Cir. Dec. 27, 2001)). Social Security Ruling 85-15 states that stooping, which is defined as bending the body downward and forward by bending the spine at the waist, is required to do almost any kind of work, especially when objects below the waist are involved. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). The Ruling also explains that "[i]f a person can stoop occasionally (from very little up to one-third of

31

the time) in order to lift objects, the sedentary and light occupational base is virtually intact." *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992).

The court also notes that the state agency physicians determined that Thompson was limited to occasional climbing. (R. at 111, 115.) Social Security Ruling 85-15 clarifies that limitations in climbing and balancing can have different effects on the occupational base depending on the degree of the limitation and the type of job, and therefore certain occupations *may* be ruled out, e.g. the light occupation of construction painter. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992) (emphasis added). However, there is nothing to suggest that a restriction to occasional climbing would preclude the ability to perform "substantially all" remaining light occupations. As such, the ALJ's failure to specifically include these limitations in his formal residual functional capacity finding constitutes, at most, harmless error not requiring remand, as these limitations do not impact Thompson's ability to perform light work.

## IV. Conclusion

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Thompson's motion for summary judgment.

An appropriate order will be entered.

**ENTER:** This _11th_ day of September, 2008.

32

_____

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

33